IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs September 15, 2020

## KEVIN L. FRENCH v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Davidson County**
**No. 2010-C-2466    Steve R. Dozier, Judge**

_____

### No. M2019-01766-CCA-R3-PC

_____

The Petitioner, Kevin L. French, appeals the denial of his petition for post-conviction relief from his convictions for first-degree premeditated murder, first-degree felony murder, and especially aggravated robbery. On appeal, he argues that: (1) he received ineffective assistance of counsel at trial and on appeal; (2) the State committed prosecutorial misconduct; (3) the State committed a <u>Brady</u> violation; and (4) he is actually innocent. After review, we affirm the denial of the petition.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which NORMA MCGEE OGLE, J., joined. THOMAS T. WOODALL, J., not participating.

Samuel E. Wallace, Jr., Nashville, Tennessee, for the appellant, Kevin L. French.

Herbert H. Slatery III, Attorney General and Reporter; Samantha L. Simpson, Assistant Attorney General; Glenn Funk, District Attorney General; and J. Wesley King, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

### FACTS

The Petitioner and Leangelo Ramey, a co-defendant who was tried separately, were indicted for the first-degree premeditated murder of Andre Veals, the felony murder of Andre Veals, and the especially aggravated robbery of Andre Veals. Another co-defendant, the Petitioner's brother Jonathan French, was indicted for making a false report. A Davidson County jury convicted the Petitioner as charged, and he was sentenced to an effective term of life imprisonment. This court affirmed the Petitioner's convictions on

direct appeal but remanded for the trial court to merge the premeditated murder and felony murder convictions. State v. Kevin Lamont French, No. M2013-01270-CCA-R3-CD, 2014 WL 3530947, at *1 (Tenn. Crim. App. July 16, 2014), perm. app. denied (Tenn. Nov. 20, 2014). The Tennessee Supreme Court denied further appellate review.

The underlying facts of the case were recited by this court on direct appeal as follows:

Metro Nashville Police Officer Adam Weeks testified that on November 16, 2008, he was dispatched "just before 3:00 p.m." to a shooting in progress at Carl's Car Wash on Gallatin Pike in Davidson County. He found the victim lying on the ground. Medical personnel arrived shortly thereafter. Officer Weeks secured the crime scene and began logging potential witnesses and other responding officers. In a photograph of the crime scene, Officer Weeks identified [the Petitioner]'s brother, Jonathan French, who was standing outside the crime scene tape talking to an investigator. He also identified several photographs of a tan Chevrolet Trailblazer registered to the French family, which was parked beside the car wash.

Kimberly McLemore testified that she was vacuuming her car's interior at the car wash that day, and she observed a young man -- the victim -- walk by her car, talking on a cellular telephone. She then saw a car "that still had soap all over it" drive out of a wash bay. The car was "four door, metallic blue [,] . . . set up high on tires and r[i]ms." The car stopped by the victim, and the driver opened his door. Ms. McLemore said that the victim and the driver conversed but that she could not hear their words over the vacuum cleaner. She continued to vacuum but also looked toward the two men occasionally because they were near sports equipment that she had placed on the ground. Ms. McLemore testified that she then heard three gun shots and that she dived into her car. She heard "tires screeching" and saw the victim "staggering . . . like he was trying to walk away." Ms. McLemore said that she "was screaming" and "was frantic." She saw the victim "drop[ ] to his knees." She said that the blue car tried to run over the victim, "but they couldn't, so the tires were spinning out." She continued, "And as the tires continued to spin as they were trying to go forward, they just ran over him." Ms. McLemore testified that she did not know who fired the shots. She described the driver of the blue car as "a black male" wearing "a black stocking cap." Ms. McLemore said that she was "[v]ery close" to the gunfire and that there was a bullet hole in her car from the incident.

- 2 -

Ms. McLemore further testified that on November 20, 2008, she met with Detective Paul Harris to attempt to identify someone involved in the shooting. She said that in a photographic lineup, she circled "the gentleman . . . [who] looked familiar to me, [who] was driving the blue car." Ms. McLemore agreed that she told Detective Harris, "'100 percent sure, no, but I do believe that's the guy I saw.'" She testified that she had been watching both the driver of the blue car and the victim because she "didn't know if these guys were going to steal [her softball equipment] or what, so [she was] constantly looking out of [her] car to make sure . . . that they [didn't] get [her] stuff" and that "some people you just don't forget."

Terry Eubanks testified that on November 16, 2008, he was visiting friends approximately one block from the car wash where the victim died. He recalled seeing a car driving down the street that "had soap suds all over it." Soon thereafter, he saw the same car driving the opposite direction, back to the car wash. Mr. Eubanks described the car as "a Ford, blue with big black r[i]ms on it." He said that he could not see who was inside the car because the windows were tinted. Shortly after seeing the car for the second time, Mr. Eubanks said that he heard "several shots, then the car came flying back down the street."

Ivory Kelly testified that he was at the car wash when the victim was murdered. Mr. Kelly said that he was behind the wash bays drying off his car when he saw a blue car pull into a wash bay. A young man, the victim, exited the car and began to wash it. Mr. Kelly then saw "a gold SUV" pull into the car wash parking lot. Two men exited the gold SUV and approached the victim. They spoke, but Mr. Kelly could not hear what was said. He said that it appeared like the men knew each other. Mr. Kelly then saw the blue car back out of the wash bay. He testified that one of the men from the SUV was driving the blue car at that point. The other man from the SUV was left at the car wash and was wearing "a Jamaican cap." Mr. Kelly saw the victim walking across the street, talking on his cellular telephone. The man wearing the Jamaican cap sat in the SUV for a minute and might have been on his telephone. Mr. Kelly said that a few minutes later, the blue car returned and pulled into the wash bay where it had been before. Then, the car backed out and pulled inside another bay. At that point, Mr. Kelly heard two gunshots. Mr. Kelly testified that he saw the blue car "coming out of the stall" and saw "a body rolling up under the car." Then, the second man from the SUV approached Mr. Kelly, so he "jumped in [his] car," drove to AutoZone, and called 9-1-1. Mr. Kelly testified that he tried to identify the men from the

SUV in a photographic lineup but was unsuccessful because he did not see their faces well.

On cross-examination, Mr. Kelly admitted that he did not actually see the two men exiting the SUV but that he assumed they had done so. He said that he knew only one person was in the blue car because he could see through the windshield despite the windows being tinted.

Christopher Savage testified that he was acquainted with [the Petitioner] and had been "real [sic] good friends" with the victim. Mr. Savage testified that both [the Petitioner] and the victim had dated a woman named Amanda Crawford. Mr. Savage recalled being at a friend's party on October 25, 2008, which [the Petitioner], the victim, and Amanda Crawford also attended. Mr. Savage testified that he witnessed "an altercation in the street between" [the Petitioner] and the victim. He explained, "[the Petitioner] . . . attempted to walk towards [the victim] with a gun in his hand." Mr. Savage said that [the Petitioner] appeared angry and that he believed [the Petitioner] would have attempted to shoot the victim if Ms. Crawford and [the Petitioner]'s brother had not stopped him. According to Mr. Savage, he could not hear anything said by either [the Petitioner] or the victim, but the area was well-lit. He said that [the Petitioner]'s gun was "black and gray" and was either a .380 caliber or 9mm. Mr. Savage testified that after Ms. Crawford and [the Petitioner]'s brother broke up the altercation, Ms. Crawford and [the Petitioner] walked back to the house, and the victim stayed by his vehicle.

On cross-examination, Mr. Savage said that when Ms. Crawford was breaking up the altercation, she asked [the Petitioner] what he was doing and that [the Petitioner] replied, "'[O]h, so you fixing [sic] to save him[;] you [sic] taking up for him. . . .'" Mr. Savage said that he tried to make peace between [the Petitioner] and the victim afterwards, but no one said anything. They went their separate ways at that point. Mr. Savage testified that the victim typically drove a maroon Caprice but also owned a blue Crown Victoria.

Metro Nashville Police Department ("MNPD") Lieutenant Frank Ragains investigated the crime scene in this case. He testified that there were blood drops on Ms. McLemore's car and that a blood trail led from her car through a car wash bay to the victim's body. There were also drag or burn marks that showed where the victim "had been hit and was carried by a vehicle." The State admitted photographs of the crime scene and the crime

- 4 -

scene diagram through Lieutenant Ragains' testimony. On cross-examination, Lieutenant Ragains testified that he recovered two spent 9mm casings and one live 9mm round from the scene.

Lynn Mace, a crime scene investigator for the MNPD, testified that she processed the gold/tan Trailblazer found at the crime scene for evidence. She lifted fingerprints, which were compared by another individual, and she collected papers that had [the Petitioner]'s name on them, including a pay stub and a social security card. She did not recall finding any papers bearing the names Eric French, Jonathan French,[1] or Leangelo Ramey. Felicia Evans, also a crime scene investigator, testified that she attempted to lift fingerprints from the shell casings found at the scene but was not successful. MNPD fingerprint examiner Larry Farnow testified that he compared fingerprints collected from the tan Trailblazer with known fingerprints of [the Petitioner] and Leangelo Ramey. The fingerprints matched those of [the Petitioner].

Tennessee State Trooper Kasey Fitts testified that in November 2008, he was employed by the Millersville Police Department. In that capacity, he was dispatched to a vehicle fire on I-65 North near mile marker 100 on November 16, 2008. He arrived at 8:07 p.m. and observed a Ford Crown Victoria "fully engulfed in flames." He ran the vehicle tag number and learned that the vehicle had been listed as stolen. The fire department extinguished the fire, and the vehicle was towed away.

Retired MNPD Detective Johnny Lawrence testified that he processed the victim's "burned out vehicle" for evidence. He collected fingerprints, "but they were not good quality." He also swabbed the door handles for DNA evidence. Detective Lawrence said that he "[c]ollected some possible human tissue . . . from the right rear wheel area." He also found blood on the underside of the vehicle.

MNPD Detective Warren Fleak testified that he executed a search warrant at a residence on East Marthona Road that was associated with [the Petitioner]. He recovered a nonfunctional Larsen .380 semi-automatic pistol, a Colt Cobra .38 special revolver, and a Glynnfield model 778 12-gauge shotgun from the residence. The .38 special and the shotgun were both loaded. Detective Fleak also recovered additional ammunition: .38 special rounds, 12-gauge rounds, and .32 auto rounds.

---

[1] The record indicates that Jonathan French is also known as Eric French.

Tennessee Bureau of Investigation ("TBI") Special Agent and forensic scientist Shelly Betts testified as an expert in firearms and toolmark identification. She compared the fired bullets from the crime scene with firearm evidence recovered from East Marthona Road and Banberry Drive (residence of co-defendant Ramey's mother). She said that the 9mm ammunition collected from Banberry Drive were from a different manufacturer than the ammunition recovered at the crime scene and that the one fired cartridge case from Banberry Drive did not have the same markings as ammunition from the crime scene. Agent Betts also said that the fired cartridge cases from the crime scene had not been fired from any of the firearms collected at East Marthona Road. Agent Betts testified that the 9mm cartridge cases found at the crime scene had been fired from the same weapon and that "the markings that were found on those cartridge cases are typical of what we see when a cartridge is fired in a Highpoint firearm." The unfired 9mm cartridge from the crime scene was from the same manufacturer and was the same type as the fired cartridges from the crime scene.

MNPD Officer William Stewart testified that he spoke to [the Petitioner] at the crime scene on November 16, 2008. Officer Stewart said that [the Petitioner] approached him to ask when he would be able to recover his mother's car, which was inside the crime scene. [The Petitioner] also told Officer Stewart that he knew the victim and that the victim's car was across the street. However, the car to which [the Petitioner] pointed was not a blue Crown Victoria. Officer Stewart could not recall the make and model of that car.

On cross-examination, Officer Stewart said that he spoke with the people inside the car to which [the Petitioner] had pointed, whom he learned were the victim's mother and girlfriend. They showed him paperwork indicating that the car was owned by the victim. Officer Stewart agreed that the car might have been a burgundy Caprice.

MNPD Detective Curtis Hafley testified that he was dispatched to the crime scene on November 16, 2008. Subsequently, he went to the residence of [the Petitioner]'s parents on Forrest Avenue to ascertain the location of a Chevrolet Suburban. He explained that he "was just going simply to find" the vehicle and that he had no other information about it. While at the residence, Detective Hafley spoke with [the Petitioner]'s parents. They called [the Petitioner], and Detective Hafley spoke with [the Petitioner] by telephone. Detective Hafley returned to the scene and spoke with [the Petitioner] in person at the parking lot across the street from the car wash.

- 6 -

[The Petitioner] told Detective Hafley that he had driven the Trailblazer earlier that day but that he had exchanged vehicles with his brother because his brother had planned to wash the Trailblazer. [The Petitioner] said that the vehicle exchange took place on Andy Street, at a house where [the Petitioner] was going to have his hair styled. [The Petitioner] further stated that after he left the house on Andy Street, he received a telephone call about the Trailblazer. Detective Hafley said that he found it unusual that [the Petitioner] was not wearing a jacket that day because "[i]t was the coldest day of the year." He also recalled commenting to [the Petitioner] that [the Petitioner] had not stayed to get his hair styled "because his hair was not freshly fixed." Detective Hafley said that the Trailblazer did not appear to have been recently washed.

MNPD Detective Paul Harris testified that he was the lead investigator in this case. He said that while he was at the crime scene, he was told that a 9-1-1 caller had "notified dispatch that the persons responsible for this had arrived in a gold Chevy [T]railblazer." He also testified that the victim had called 9-1-1 himself. The following day, the victim's car was discovered by the Millersville Police Department, and Detective Harris had the vehicle brought to Nashville. Detective Harris testified that during the course of his investigation, he developed [the Petitioner] as a suspect. He said that he showed a photographic lineup to Ms. McLemore, who identified [the Petitioner]'s photograph.

Detective Harris interviewed [the Petitioner] on November 25, 2008, outside of the East Marthona residence. [The Petitioner] told him that on the day of the victim's murder, he had driven his brother's Expedition because his brother had taken the Trailblazer that [the Petitioner] typically drove. [The Petitioner] did not mention a vehicle exchange. [The Petitioner] also said that he had gotten his hair braided at a location on Riverside Drive. While at the Riverside Drive location, [the Petitioner] said that he received a call from James Crawford on a friend's telephone informing him that his Trailblazer was inside a crime scene. [The Petitioner] explained that he had left his cellular telephone at his Forrest Avenue house and that his telephone was in the same place when he returned home as it was when he left. He told Detective Harris that he spoke with his brother, Jonathan French, once on November 16, while Jonathan French was driving to a restaurant. [The Petitioner] said that the last time he had seen the victim was at James Crawford's birthday party and that [the Petitioner] had an altercation with Christopher Savage at the party. [The Petitioner] denied having a gun at Mr.

Crawford's party and said that he did not "own a gun . . . [had] never even touched a gun in his life."

Detective Harris testified that he interviewed [the Petitioner] again at the East Marthona address on May 19, 2009. Sergeant Postiglion was also there and did the majority of the questioning. In that interview, [the Petitioner] was asked whether anyone had borrowed his cellular telephone on the day of the murder, and [the Petitioner] responded that no one else used his telephone. The recording of the May 19 interview was played for the jury. In the recording, the police officers told [the Petitioner] that his cellular telephone "ping[ed] off a tower" in Millersville, where the victim's car was found. Detective Harris testified that the police had obtained [the Petitioner]'s cellular telephone records via a subpoena, and the State introduced those records, along with the telephone records of the victim, Amanda Crawford, and Jonathan French, into evidence.

On cross-examination, Detective Harris testified that the police searched two locations associated with co-defendant Leangelo Ramey, one of which was Banberry Drive, where the police found twenty 9mm live rounds and one 9mm cartridge casing. Regarding the weapons found at [the Petitioner]'s East Marthona residence, Detective Harris testified that he knew before the search that weapons would be in the house and that he had been told by numerous people that [the Petitioner] was "frequently armed and carrie[d] firearms." However, he agreed that the weapons found at East Marthona were not registered to a particular person.

On re-direct examination, Detective Harris recalled that Amanda Crawford told him that [the Petitioner] pulled a gun on the victim at James Crawford's party. He could not remember whether James Crawford and Christopher Savage had also seen the gun. Regarding the victim's 9-1-1 call, Detective Harris testified that he obtained a recording of the call by recording it himself while the communication center played their recording for him over the telephone.

On recross-examination, Detective Harris agreed that the victim told the 9-1-1 dispatcher, "'[S]omebody just stole my car and robbed me at gun point.'" He further agreed that the victim gave "additional address and car information," then said, "'[H]old on, now he [sic] pulling back in the parking lot[;] they [sic] playing with me, man, just send the police.'" Finally, Detective Harris agreed that the victim did not mention the name of the person who had taken his car.

TBI Agent Michael Frizzell testified as an expert in the field of communication records in criminal investigations. He explained that "pinging" means that a cellular telephone registers with a network by transmitting a paging signal to the network so that the network knows the location of the telephone. This information allows the network to use the cellular site closest to the telephone to communicate with that telephone. Agent Frizzell said that a cellular telephone will ping if, for example, a call is made or received, a text message is sent or received, or if a smartphone application updates itself. However, sometimes the networks will "load shift[ ]" during high-volume periods by sending the signal to the next-closest tower. Agent Frizzell testified that he reviewed telephone records associated with [the Petitioner], Amanda Crawford, and Jonathan French and prepared a synopsis of the calls between [the Petitioner]'s telephone and the other two. In particular, the State pointed out calls from [the Petitioner] to Amanda Crawford at 12:59 p.m. and 10:17 p.m., calls from [the Petitioner] to Jonathan French at 2:22 p.m. and 5:19 p.m., and calls from Jonathan French to [the Petitioner] at 10:46 a.m. and 2:16 p.m. On cross-examination, Agent Frizzell admitted that he did not know who had possession of [the Petitioner]'s telephone on the day of the murder. He acknowledged that [the Petitioner]'s telephone records indicated that his telephone called numbers that later testimony showed belonged to Montez Jennings and Mr. Jennings' girlfriend.

David Kline, an employee with the Metropolitan Planning Department's mapping division, testified that he prepared several maps for the State showing locations of interest in this case. In particular, he plotted on a map the locations of Carl's Car Wash, the victim's burning car, and cellular towers pinged by [the Petitioner]'s telephone. He said that he plotted the cellular towers based on [the Petitioner]'s telephone records and information in a database regarding the location of cellular towers. According to the information he received, [the Petitioner]'s cellular telephone pinged a tower near where the victim's burning car was found at the following times: 5:42:01 p.m.; 8:03:22 p.m., 8:10:34 p.m., and 8:11:36 p.m. Mr. Kline also plotted the towers pinged by Jonathan French's telephone. Jonathan French's telephone pinged the tower near where the victim's burning car was found at the following times: 5:53:02 p.m., 5:53:28 p.m.; 5:55:15 p.m.; 5:58:55 p.m.; and 5:59:29 p.m.

Montez Jennings testified that he had known co-defendant Leangelo Ramey since he was ten or eleven years old and that he did not know [the

Petitioner]. Mr. Jennings said that Ramey told him "that he robbed a guy, he shot him[,] and he ran him over[,] and he burned his car." Mr. Jennings testified that Ramey also showed him a weapon, which he described as a smaller caliber, all-black gun. He believed it "was like a .9 millimeter or something." He said that around the time of the victim's murder, Ramey had shoulder-length dreadlocks and drove a white Dodge Dynasty.

On cross-examination, Mr. Jennings said that Ramey came to his apartment the day after the victim's murder. Ramey "told [him] about the incident at the car wash" and showed him a weapon. After that conversation, Mr. Jennings made him leave the apartment. While they were outside of the apartment, Ramey repeated his story. Mr. Jennings had no contact with Ramey after that day except for seeing him briefly at a shopping mall. Mr. Jennings said that he was not afraid of Ramey but "was scared of the whole situation." He said, "[A]ll I know is that he told me that he killed someone." He stated that Ramey had been "kind of . . . crazy" when they were growing up and that he had "[m]ood swings and . . . real erratic behavior." He had never known Ramey to carry weapons, however. Mr. Jennings did not recall whether Ramey called him the night of November 16, 2008, but he acknowledged that the records shown to him by defense counsel displayed calls to his telephone number and to his girlfriend's telephone number.

Keyosha Blair testified that she had a son with [the Petitioner]. She stated that she did not know [the Petitioner] in November 2008 and that they met sometime in 2009. She said that after he was incarcerated, they continued to communicate, mostly about their child. Ms. Blair testified that [the Petitioner] asked her "to say that he was with [her] at the time" of the victim's murder, despite her not having met him yet. Ms. Blair identified a letter that she said [the Petitioner] sent her from jail in which [the Petitioner] told her to say that she was with him while he was getting his hair braided and that he picked her up in an Expedition.

TBI Special Agent Jennifer Shipman analyzed several exhibits in this case for DNA. She testified that the four swabs from underneath the victim's car were positive for the presence of blood. Further testing of one of the swabs revealed DNA that matched the victim's DNA.

Leangelo Ramey, [the Petitioner]'s co-defendant, testified as a witness for the State. He said that he had known [the Petitioner] for more than a year prior to the victim's murder. He described [the Petitioner] as a friend and said that [the Petitioner] helped him find work. Ramey testified

that he spent the night on November 15-16, 2008, at [the Petitioner]'s house, which was located on a street beginning with the letter "M" in the Madison area. Ramey said that [the Petitioner] picked him up on November 15 in a brown, four-door sedan.

Ramey said that the next day, he asked [the Petitioner] for a ride to a friend's house. Ramey said that they left [the Petitioner]'s house in [the Petitioner]'s Trailblazer. Instead of taking Ramey to his friend's house, however, [the Petitioner] stopped at a car wash off Gallatin Pike. Ramey testified that [the Petitioner] parked next to the car wash, not inside one of the wash bays, and left the vehicle. Ramey said that [the Petitioner] did not tell him why they had stopped. He waited for [the Petitioner] to return, but after "a little while," he got out of the vehicle to look for [the Petitioner]. Ramey said that he first went to the back of the car wash and then to the front. He did not see [the Petitioner] at first. Instead, he saw a blue car pass him that had "a lot of soap on it." He testified that he could not tell who was driving the blue car. Fifteen to twenty seconds later, he heard two gunshots and then "a big vroom . . . like just a loud roar of a car." Ramey said that he started moving toward the back of the car wash when he saw "the vehicle and [saw] a body rolling from . . . up under the vehicle coming [his] way full speed." Ramey testified that he saw [the Petitioner] in the driver's seat. [The Petitioner] drove away from the car wash "up towards Dozier." Ramey said that at that point, he was in "a state of panic," so he walked away from the car wash and went to his friend's house.

Ramey testified that he stayed at his friend's house for a time, then he called [the Petitioner] from his friend's telephone to ask for a ride home. [The Petitioner] told him "that he would get in touch with [Ramey] when . . . he [got] a chance." Ramey explained that he called [the Petitioner] because he was the only person who would give him a ride. When [the Petitioner] picked him up, [the Petitioner] was driving the brown sedan he had driven the previous day. On the way to the home of Ramey's girlfriend, [the Petitioner] gave Ramey a cellular telephone that Ramey assumed was his.

Later, [the Petitioner] called Ramey on that telephone from a number Ramey believed was that of [the Petitioner]'s brother. In that conversation, [the Petitioner] asked Ramey to do something for him but did not elaborate. Ramey drove his own car to [the Petitioner]'s house in the Madison area. When he arrived, [the Petitioner] told him "to go pick up the car" at a particular apartment complex. Ramey explained that "the car" was "the blue car from the car wash." Ramey found the blue car and began driving it

towards where [the Petitioner] wanted him to go, but he got lost. He called [the Petitioner], who told him that he would "be there in a minute." [The Petitioner] arrived and gave him directions to the interstate. Ramey said that he drove onto the interstate and headed away from Nashville. Ramey testified that he called [the Petitioner] "a couple of times" to tell [the Petitioner] that he did not know where he was going. [The Petitioner] told him, "'[J]ust drive[.]'" Eventually, Ramey pulled over to the side of the road, and [the Petitioner] came to pick him up. At that point, [the Petitioner] was driving a white SUV that Ramey believed belonged to [the Petitioner]'s brother. [The Petitioner] took Ramey back to Ramey's car. Ramey testified, "[T]hat's the time when he told me I need to get rid of the car." Ramey said that [the Petitioner] specifically told him to burn the car. After [the Petitioner] dropped him off at his car, Ramey obtained a gasoline can and gasoline, then drove back to the blue car. He poured the gasoline in the car and lit it on fire. Ramey said that he drove away but had to call [the Petitioner] several times for directions. He met [the Petitioner] to return [the Petitioner]'s telephone.

Ramey testified that he continued to spend time with [the Petitioner] after November 16 but not as often. Ramey recalled that [the Petitioner] asked him not to tell anyone anything. Every time he saw [the Petitioner] thereafter, [the Petitioner] asked him whether he had talked to the police. He said that [the Petitioner]'s brother was with [the Petitioner] once when [the Petitioner] asked Ramey about talking to the police. When the police contacted Ramey, he did not tell them anything at first. The second time he spoke with the police, Ramey told them that he had been at the car wash with [the Petitioner] but that he had not seen anything. He admitted that he did not tell them the truth but stated that he was afraid that he would "end up like [the victim]." Ramey said that he never called Montez Jennings on November 16, 2008, did not visit Mr. Jennings the next day, and did not show Mr. Jennings a gun at any point. Ramey testified that he did not remember the clothing that he and [the Petitioner] were wearing the day of the murder but recalled that he wore his hair in dreadlocks and that [the Petitioner] wore his hair in cornrow braids. He remembered that [the Petitioner] was wearing a black hairnet-like cap.

On cross-examination, Ramey testified that his mother lived on Banberry Drive and that he might have had possessions stored at her house. He denied that the 9mm bullets found at that address were his. Ramey said that he did not have a cellular telephone when he was at the car wash. When asked whether he had made any "deals" with the State, Ramey said that he

had not. However, he agreed that he signed an immunity agreement with the State whereby his testimony at [the Petitioner]'s trial would not be used against him. Ramey testified that he burned the car for [the Petitioner] because he believed that he would be "dealt with if [he] said anything or [if][he] didn't cooperate with [the Petitioner]." He further testified that he was not afraid of [the Petitioner] because he did not do anything to make [the Petitioner] mad. On redirect examination, Ramey clarified that his charges were still pending and that he would be tried for first degree murder and especially aggravated robbery.

The State next presented information about the victim's 9-1-1 call. The custodian of records for the Nashville Emergency Communication Center testified that the center's recording of the victim's call had been purged from their system, pursuant to their standard practice, in January 2012. The victim's mother testified that she had listened to a 9-1-1 recording and identified the victim's voice on it. The 9-1-1 recording, apparently the same recording made by Detective Harris, was played for the jury.

Deputy Chief Medical Examiner Dr. Adele Lewis testified that she performed the victim's autopsy and determined that his "cause of death was a gunshot wound to the torso and multiple blunt force injuries." She specified that the bullet entered the left side of the victim's chest and exited on the right side, breaking three ribs and going through his heart, right lung, and liver. Dr. Lewis testified that the victim had many scrapes and bruises, "some bleeding in the deep soft tissues of the scalp," and "very severe pelvic fractures." Dr. Lewis explained that the victim's "bones in the front of the pelvis were broken and separated from each other, as were both of the bones in the lower part of the back broken and separated from each other." She opined that "a great deal of force" was required to cause the pelvic fractures. Dr. Lewis described the abrasions to [the Petitioner]'s lower back and buttocks as "road rash." In addition, the victim had an injury to his abdomen that "might [have] been a burn." Using autopsy photographs -- Exhibits 41A-H -- and a photograph from the crime scene -- Exhibit 7C, Dr. Lewis described the victim's various injuries to the jury. Following her testimony, the State rested its case.

Amanda Crawford testified on behalf of [the Petitioner]. She said that he did not pull a gun on the victim during the party in October 2008 and that she would have been the only person close enough to see if he had. Ms. Crawford admitted that she had seen [the Petitioner] with a gun during a New Year's Eve celebration, when "everybody was shooting" guns at midnight.

On cross-examination, Ms. Crawford testified that she dated the victim for "a couple [of] months" but had been in a relationship with [the Petitioner] "off and on" since she was sixteen years old. Ms. Crawford agreed that when Detective Harris interviewed her on November 18, 2008, she initially told him that [the Petitioner] did not pull a gun on the victim at the party but later admitted that he had done so. Ms. Crawford further agreed that she told Detective Harris that [the Petitioner] "carrie[d] a gun quite often." Regarding [the Petitioner] and his brother, Ms. Crawford agreed that she told Detective Harris that she had never known [the Petitioner]'s brother to drive [the Petitioner]'s vehicle nor [the Petitioner] to drive his brother's vehicle without his brother also being in the vehicle.

Jonathan Eric French, [the Petitioner]'s brother, testified that on November 16, 2008, he went to his parents' house on Forrest Avenue to pick up the family's Trailblazer, which he said was silver, so he could clean it. He took it to Carl's Car Wash and parked it on the side. He recalled seeing a vehicle leave that still had soap on it. Jonathan French also heard gunshots, so he left the car wash and went to AutoZone to purchase a car part. However, the store did not have the part he wanted. When he tried to go back to the car wash, it had been cordoned off. Eventually, he was taken to the police precinct for questioning. He said that the police began questioning him at 3:00 or 4:00 p.m. and that the questioning lasted four to six hours. After the police took him home, he went back to the crime scene with his parents and stayed until the Trailblazer was towed. He said that he did not have his cellular telephone with him that day.

On cross-examination, Jonathan French said that he did not see how his interview could only have lasted "one hour and [fifty-seven] minutes and [thirty] seconds," which was the length alleged by the State. When asked whether it would surprise him if Detective Harris had watched the surveillance video from AutoZone and never saw him in the store, Jonathan French said, "I'm pretty sure he'd seen me if he pulled it."

Mary French, [the Petitioner]'s mother, testified that the police came to her house on November 16, 2008, but never told her why. While the officers were there, [the Petitioner] called her. The police talked to [the Petitioner] over the telephone. Mrs. French went with her husband and Jonathan French to Gallatin Pike between 5:30 and 6:00 p.m. On cross-examination, Mrs. French said that she owned houses on Forrest Avenue and Marthona Road and that her sons sometimes stayed at Marthona Road and

- 14 -

sometimes at Forrest Avenue. She could not recall whether [the Petitioner] or Jonathan French were at her house on Forrest Avenue when she awoke on November 16, 2008.

Archie French, II, [the Petitioner]'s brother, testified that on November 16, 2008, two police officers came to his mother's house looking for [the Petitioner]. The officers learned that [the Petitioner] was at a tobacco store across the street from the car wash, so Archie French met [the Petitioner] at the tobacco store "a little bit before 4:30." Archie French said that he and [the Petitioner] waited there until the Trailblazer was towed.

On cross-examination, Archie French said that when Jonathan French and their parents arrived, he and [the Petitioner] went to get a digital camera from Archie French's house, to get batteries for the camera, and then back to his house to charge the camera when they could not find appropriate batteries. They returned to the crime scene, and he took photographs of the area. He agreed that he had never told anyone that he knew where [the Petitioner] was the entire afternoon. After Archie French's testimony, the defense rested.

The State recalled Detective Harris as a rebuttal witness. He said that he had reviewed the videotaped interview with Jonathan French and found that the timestamp indicated the interview lasted one hour and fifty-seven minutes. Detective Harris stated that the videotape represented the full extent of Jonathan French's questioning. Detective Harris testified that Jonathan French told him during that interview that he had gotten in the wrong line at the auto parts store, so he left rather than wait in another line.

Detective Hafley also testified as a rebuttal witness. He said that he transported Jonathan French from the police precinct to his home and that he recorded the entire interaction. He "timestamp[ed]" the end of the recording by stating the time he dropped off Jonathan French, which was 6:12 p.m.

Id. at *1-11 (footnote in original).

In January 2015, the Petitioner filed a timely pro se petition for post-conviction relief, followed by two amended petitions through subsequently appointed counsels as well as a second pro se petition which was deemed an appendix to the second amended petition. Relevant to this appeal, the Petitioner argued that he received ineffective assistance of counsel due to counsel's failure to seek suppression of his cellphone records; seek suppression of the fruits of the searches of two residences associated with him; object to

the State's mischaracterization of Ms. McLemore's testimony in its closing argument; object to redaction of his taped interview; and effectively cross-examine witnesses. He also argued that he received ineffective assistance with regard to his direct appeal because four of the issues presented to this court were deemed to be waived for having not been included in the motion for new trial. The Petitioner additionally claimed that the State committed prosecutorial misconduct in closing argument; the State committed a Brady violation, i.e., withheld exculpatory evidence; and that he is actually innocent.

The post-conviction court conducted an evidentiary hearing, at which Detective Paul Harris with the MNPD testified that on November 19, 2008, he applied for a court order to obtain cellphone records for phone number 615-730-1410 from November 1, 2008, to November 19, 2008, which the trial court granted. In the application, Detective Harris referenced the Stored Communications Act, 18 U.S.C. 2703, as the statutory authority for the application. Detective Harris recalled that the cellphone records were used at trial "to corroborate what the co-defendant testified to."

Detective Harris also applied for a search warrant to search a residence at 332 East Marthona Drive in Madison, Tennessee, for "any nine-millimeter pistol or device capable of firing a nine-millimeter projectile. Any and all nine-millimeter ammunition to include live rounds, projectiles and shell casings." He explained that searching for those items was important because nine-millimeter cartridge casings were collected from the crime scene and the body of the victim. He acknowledged that the statement of facts in support of the warrant application, which was obtained on September 3, 2009, was based in part on statements he received up until January 26, 2009. During the execution of the search warrant, officers seized several firearms, unfired ammunition of different calibers, marijuana, and a digital scale. Detective Harris said he was unaware if any forensic tests were performed on the firearms to prove that they had been handled by the Petitioner.

Detective Harris acknowledged that one of the applications for a court order to obtain cellphone records referred to a surveillance video taken from a business across the street from the car wash where the murder took place. He agreed that the police took custody of the surveillance video footage at some point and he reviewed it, but he had no knowledge of whether the Petitioner received the recording in discovery. Detective Harris recalled that a portion of the road in front of the car wash could be seen on the video, but the car wash itself could not.

Asked to review the transcript from his testimony at the Petitioner's trial, Detective Harris acknowledged that he testified that Ms. McLemore identified the Petitioner in a photographic array as the person who shot the victim. However, the transcript reflected that Ms. McLemore actually testified that she did not know who fired the shots. At the post-conviction hearing, Detective Harris recalled that Ms. McLemore "was able to view

some of the incident while she was in the process of vacuuming," but he could not recall "exactly how she described the events she saw." After reviewing certain documents, Detective Harris acknowledged that when Ms. McLemore viewed a photographic array, she circled the Petitioner's photograph and wrote that she was not "100 percent sure . . . [b]ut [she] . . . believe[d] that's the guy [she] saw." He additionally acknowledged that it did not appear that Ms. McLemore ever specifically said that she saw the Petitioner shoot the victim.

On cross-examination, Detective Harris agreed that the law pertaining to obtaining cellphone records changed many years after he obtained the cellphone records in the present case. Had the current law, which required a search warrant to procure such records, existed at the time he was working on this case, he would have applied for one. Detective Harris believed that he could have successfully obtained a warrant had case law required it at the time.

On redirect examination, Detective Harris recalled that there was a 911 recording in which the victim called and reported that "[s]omebody stole my car" but did not specifically name the Petitioner.

Detective Curtis Hafley with the MNPD testified that he applied for a warrant to search the residence at 15144 Forrest Avenue on September 3, 2009. In the statement of facts in support of probable cause for the search warrant, Detective Hafley relied on information provided by Detective Harris. Detective Hafley recalled that he interviewed Ms. McLemore at the scene of the shooting. He acknowledged that in the report of the interview, he quoted Ms. McLemore as stating that "[s]he doesn't think she can ID the driver if she saw."

The Petitioner testified to his various grievances with counsel's representation and disputes with the evidence. When discussing his disputes with the evidence, the Petitioner asserted that he was framed by Detective Harris, who the Petitioner claimed knew the identity of the real murderer. Among his complaints regarding counsel, the Petitioner asserted that he told counsel he did not want the State to admit a redacted version of his statement to police at trial. He elaborated that he wanted to introduce the entire statement because it would have offered further explanation for his comment "that I can't stand the police[.]"

The Petitioner said that counsel should have done a better job questioning witness Kimberly McLemore because her testimony was "opposed to physical law." The Petitioner claimed that there were witnesses he wanted counsel to call to testify, namely William Van Buren and Bradley Jaimon Bryant, but counsel "said we don't need them." He alleged that those witnesses gave a description of the suspect as being about twenty-five pounds less

than he weighed at the time. The Petitioner then acknowledged that Mr. Bryant testified at trial but that counsel "never questioned him regarding the description[,]" which amounted to ineffective assistance. He agreed that neither Mr. Bryant nor Ms. McLemore identified him as the shooter at trial. The Petitioner discussed a number of other witnesses he wanted counsel to have testify at trial that counsel said were not needed.

The Petitioner also pointed to co-defendant Leangelo Ramey's testimony that the Petitioner picked him up in a Buick LeSabre the night before the incident, as well as right after the incident, but the Petitioner claimed that he did not purchase that vehicle until a month after the incident. He asserted that proof of his car ownership would call Mr. Ramey's credibility into question. However, the Petitioner acknowledged that his mother testified about his purchase of the Buick but said he was not allowed to introduce a supporting document at the trial.

The Petitioner alleged that in its closing argument, the State claimed that Ms. McLemore identified him as the shooter but in actuality, Ms. McLemore "never testified to that, she did not see the shooter." The Petitioner also alleged that he never received the surveillance video from the tobacco store across the street from the scene of the murder in discovery. He asserted that the State relied on this video as the factual basis in its warrant for the phone records of Natasha Lockett and Amanda Crawford.

On cross-examination, the Petitioner recalled that counsel informed him that the State said he was identified by Kimberly McLemore and that Leangelo Ramey was going to testify as a witness against him. With regard to appellate counsel, the Petitioner alleged that appellate counsel failed to raise issues about Ms. McLemore's statement, Detective Harris's "testifying falsely," the 911 call, and Larry Fornow's testimony.

The Petitioner's trial counsel testified that the defense theory of the case was that the co-defendant, Leangelo Ramey, stole the victim's vehicle, drove away in it "with soap blowing off of it down the street," then quickly returned to the car wash, "jumped out and shot [the victim], ran over him and dragged him under the car as he was getting away yet again[.]" Counsel noted that a witness, Montez Jennings, testified that Mr. Ramey confessed to him and showed him a firearm that looked like the type of firearm the evidence indicated was the potential murder weapon. Counsel recalled that he discussed the theory of defense with the Petitioner prior to trial.

Counsel acknowledged that he did not file a motion to suppress the cellphone tower evidence. However, he explained that he spoke with a representative from the phone company and was able to illustrate at trial that "in call times where there were lots of calls, a call may be switched from one call to the other. So questions about the accuracy of [']it pinged off of this tower[,'] that may not always be as reliable as it sounds." He did not file

- 18 -

a motion for funding to obtain an expert in the area of cell tower records because he thought that the testimony of the State's witness was going to work adequately in favor of the defense. Counsel acknowledged that he did not research case law regarding the suppression of cellphone records due to failure to obtain a search warrant.

Counsel also acknowledged that he did not file a motion to suppress the searches of the Marthona and Forrest Avenue residences due to staleness of the information or the overly broad nature of the requests. Counsel could not recall why he ultimately decided not to file a motion to suppress, but he conceded that after reading the cases and language cited in the petition for post-conviction relief that "[i]t's a possibility" he should have filed one. Counsel agreed that the recovered items were used at trial to undermine the Petitioner's credibility during the State's closing argument. He also agreed that the Petitioner could have been truthful with the police in 2008 when he said that he did not own any firearms but could have come to possess them by the time the warrants were executed in September 2009.

Counsel agreed that this court on direct appeal ruled that some of the issues appellate counsel raised were waived because they had not been included in the motion for new trial. Counsel noted that appellate counsel did not raise any of the issues that trial counsel had put in the motion for new trial.

Counsel testified that he did not receive a copy of a surveillance video from the business across the street from the scene of the murder if one existed and, had one existed, he would have obtained a copy of it so he could determine whether it was of any value to the Petitioner.

Counsel agreed that the State somewhat misstated Ms. McLemore's identification of the Petitioner in its closing argument and that he did not ask for a curative instruction or mistrial. However, counsel recalled that he made a special effort in closing argument to remind the jury that Ms. McLemore did not actually identify the Petitioner as the shooter.

Counsel recalled that co-defendant Ramey mentioned a burnt orange Buick LeSabre in a statement counsel received right before Mr. Ramey testified. The Petitioner's family informed him that they purchased that vehicle about a month after the victim's murder, and counsel asked them to find the title to the vehicle but they were unable to find it. Counsel had the Petitioner's mother testify about the timing of the Buick's purchase, but there was no physical evidence to back up her testimony to show that Mr. Ramey was lying when he said that he was "riding around [with the Petitioner] two days prior to [the murder] in a burnt orange Buick[.]" Counsel felt that he effectively cross-examined Mr. Ramey and "enjoyed the opportunity to try to prove he was lying."

Counsel said that he was not familiar with a witness named William Van Buren who was supposedly at the scene and gave the police a description of an individual he saw with the victim prior to the shooting. The description was of an individual different in size than the Petitioner but consistent with the size of Mr. Ramey. Counsel recalled that he turned a number of names over to his investigator but that it was "not unusual not to be able to find somebody[,] though."

With regard to the Petitioner's interview with the police, counsel noted that "[y]ou couldn't have heard part of what he was saying" because the Petitioner's voice box was injured from a gunshot wound when he was younger.

After the conclusion of the testimony and argument of the parties, the post-conviction court entered a detailed order denying the petition, and the Petitioner appealed.

## ANALYSIS

On appeal, the Petitioner argues that the post-conviction court erred in denying his petition because he received ineffective assistance at trial and on appeal; the State committed prosecutorial misconduct; the State committed a Brady violation; and he is actually innocent.

Post-conviction relief "shall be granted when the conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." Tenn. Code Ann. § 40-30-103. The petitioner bears the burden of proving factual allegations by clear and convincing evidence. Id. § 40-30-110(f). When an evidentiary hearing is held in the post-conviction setting, the findings of fact made by the court are conclusive on appeal unless the evidence preponderates against them. See Wiley v. State, 183 S.W.3d 317, 325 (Tenn. 2006). When reviewing factual issues, the appellate court will not reweigh the evidence and will instead defer to the post-conviction court's findings as to the credibility of witnesses or the weight of their testimony. Id. However, review of a post-conviction court's application of the law to the facts of the case is de novo, with no presumption of correctness. See Ruff v. State, 978 S.W.2d 95, 96 (Tenn. 1998). The issue of ineffective assistance of counsel, which presents mixed questions of fact and law, is reviewed de novo, with a presumption of correctness given only to the post-conviction court's findings of fact. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001); Burns v. State, 6 S.W.3d 453, 461 (Tenn. 1999).

### I. Ineffective Assistance of Counsel

To establish a claim of ineffective assistance of counsel, the petitioner has the burden to show both that trial counsel's performance was deficient and that counsel's

deficient performance prejudiced the outcome of the proceeding. Strickland v. Washington, 466 U.S. 668, 687 (1984); see State v. Taylor, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that the same standard for determining ineffective assistance of counsel that is applied in federal cases also applies in Tennessee). The Strickland standard is a two-prong test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. at 687.

The deficient performance prong of the test is satisfied by showing that "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland, 466 U.S. at 688; Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975)). Moreover, the reviewing court must indulge a strong presumption that the conduct of counsel falls within the range of reasonable professional assistance, see Strickland, 466 U.S. at 690, and may not second-guess the tactical and strategic choices made by trial counsel unless those choices were uninformed because of inadequate preparation. See Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982). The prejudice prong of the test is satisfied by showing a reasonable probability, i.e., a "probability sufficient to undermine confidence in the outcome," that "but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694.

Courts need not approach the Strickland test in a specific order or even "address both components of the inquiry if the defendant makes an insufficient showing on one." 466 U.S. at 697; see also Goad, 938 S.W.2d at 370 (stating that "failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim.").

The Petitioner asserts that he received ineffective assistance of counsel because trial counsel failed to: seek suppression of his cellphone records; seek suppression of the fruits of the searches of two residences associated with him; object to the State's mischaracterization of Ms. McLemore's testimony in its closing argument; object to redaction of his taped interview; and effectively cross-examine witnesses. He also argues that he received ineffective assistance with regard to his direct appeal because four of the

issues presented to this court were deemed to be waived for having not been included in the motion for new trial.

## A. Cellphone Records

The Petitioner claims that counsel provided ineffective assistance because he failed to file a motion to suppress the Petitioner's cell-site location information ("CSLI") that Detective Harris obtained by court order based on the Stored Communications Act. As to this issue, the post-conviction court found that counsel did not perform deficiently in failing to file such motion because the United States Supreme Court had not yet ruled at the time of trial that individuals have a reasonable expectation of privacy in their cell-site location information such to require a warrant. In addition, the court surmised that two cases cited by the Petitioner, United States v. Jones, 565 U.S. 400 (2012) and United States v. Warshak, 631 F.3d 266 (6th Cir. 2010), that he claimed counsel should have used as authority to seek suppression, were not so similar to the Petitioner's case that counsel was unreasonable for not filing a motion to suppress based on that precedent. The court also determined that it was "not persuaded that the Petitioner has established that a motion to suppress the CSLA would have been granted even if [counsel] had filed such a motion" based on the case law that was applicable at the time of the Petitioner's trial.

The record supports the post-conviction court's determinations. Detective Harris applied for and received court orders for the CSLI for phone numbers associated with the Petitioner pursuant to the Stored Communications Act, which was the requisite procedure at the time. Although the United States Supreme Court has since ruled in Carpenter v. United States, 138 S. Ct. 2206 (2018), that citizens have a reasonable expectation of privacy in their CSLI, meaning a warrant would generally be required for the State to obtain it, such was not the law at the time of the Petitioner's trial. At the time of trial, Jones, 565 U.S. 400, a case in which the United States Supreme Court held that attaching a Global Positioning System ("GPS") to a defendant's vehicle was a search under the Fourth Amendment, was the prevailing precedent regarding searches of electronic information. However, CSLI can only be used to identify the general area in which a person's cellphone is located and does not provide the same level of detail or continual location data as with GPS tracking information. See Carpenter, 138 S. Ct. at 2225 (Kennedy, J., dissenting). In addition, at the time of trial, the Sixth Circuit had held that "a subscriber enjoys a reasonable expectation of privacy in the contents of emails that are stored with, or sent or received through, a commercial ISP." Warshack, 631 F.3d at 288. However, the facts in Warshack were clearly distinguishable from those in the present case, and Warshack would have only been persuasive authority for Tennessee courts at the time of trial. As the post-conviction court concluded, while a suppression motion relying on these cases would not have been frivolous, the law at the time of trial was not so clear that the failure to file one was deficient performance. Of additional note, counsel attacked the reliability of the CSLI

at trial through his cross-examination of the cellphone company representative, which he used to show that CSLI "may not always be as reliable as it sounds." We cannot conclude that counsel rendered deficient performance in failing to file a motion to suppress, or that the result of the proceeding would have been different had a suppression motion been filed.

## B. Search of Residences

The Petitioner claims that counsel provided ineffective assistance because he failed to seek suppression of the fruits of the searches of two residences associated with him due to the search warrants being overly broad or based on stale information and that the evidence was inadmissible because it lacked relevance. In considering this issue, the post-conviction court did not belabor an analysis of whether counsel was deficient for failing to file a motion to suppress because it concluded that the Petitioner was not prejudiced by the failure.

The court observed that the main evidence recovered in the execution of the search warrants was several firearms and ammunition of different caliber than what was used in the murder. The court noted that the State used the evidence to argue that the Petitioner's having several firearms in his house tended to make it more likely that he would also have access to a nine-millimeter firearm, and also to impeach the truthfulness of the Petitioner's statement shortly after the incident that he had never touched a firearm in his life. The court cited to the testimonies of witnesses at trial, one of whom was the Petitioner's own witness, who said that the Petitioner was known to carry and use firearms. The court determined that even if the fruits of the search warrants had been suppressed, the jury would have still heard evidence that the Petitioner had access to firearms and was not totally honest with police when he said he had never touched a firearm. Therefore, the post-conviction court concluded that there was not a reasonable probability that the result of the trial would have been different had counsel successfully suppressed the recovered evidence. We have reviewed the record, and it supports the post-conviction court's determination that suppression of the evidence recovered during the searches of the residences would have had no effect on the outcome of the Petitioner's trial.

With regard to the Petitioner's challenge to relevance, we agree with the post-conviction court's assessment that "the fact that firearms were found at a location where the Petitioner stayed does tend to show that the Petitioner had access to firearms . . . [and] tend[s] to show that the Petitioner was not honest with the police about his use of firearms in his statement in November of 2008."

## C. State's Closing Argument

The Petitioner claims that counsel provided ineffective assistance because he failed to object to the State's mischaracterization of Ms. McLemore's testimony in its closing argument. He avers that the State said in its closing argument that Kimberly McLemore saw the Petitioner shoot the victim, when she actually testified that she did not know who fired the shots but had circled the Petitioner's photograph on an array indicating that she was not "100 percent sure . . . [b]ut [she] . . . believe[d] that's the guy [she] saw."

The record shows that during closing argument, the State argued that Ms. McLemore "viewed a photo lineup and was able to identify the [Petitioner]." (Trial Record Later, the State commented that Ms. McLemore "identif[ied] the [Petitioner] as the shooter." During closing argument for the defense, counsel pointed out that "Ms. McLemore testified from the stand that she looked at a photo lineup[] and said she wasn't a hundred percent sure but she circled the face of [the Petitioner] and said, it kind of looks like. It resembles him." Counsel also reminded the jury that Ms. McLemore said that she only saw the suspected perpetrator "very briefly . . . it was just an instant." At the post-conviction evidentiary hearing, counsel recalled that he made a special effort during closing argument to remind the jury that Ms. McLemore did not actually identify the Petitioner as the shooter.

In ruling on this issue, the post-conviction court recognized that counsel "*could* have made [the] objection," but it was unclear whether counsel had a tactical reason for failing to do so. The court summarized that "[e]ven if Ms. McLemore did not see the Petitioner shoot the victim, as the State characterized in its closing argument, the jury heard testimony at trial that Ms. McLemore saw the victim and Petitioner together shortly before hearing gunshots in the area where they had been." The court continued that "[w]hile there is a factual distinction between the State's summary and the precise testimony offered at trial, it would not have been unreasonable for [counsel] to avoid drawing greater attention to one of the stronger components of the State's case." Moreover, the court concluded that there was "overwhelming evidence" against the Petitioner, see Kevin Lamont French, 2014 WL 3530947, at *14, such that counsel's failure to object did not undermine its confidence in the verdict.

We conclude that the State's comment regarding Ms. McLemore's identification was enough of a reasonable inference from the evidence so as to not necessitate an objection, and counsel's addressing the State's comment in his own closing argument rather than drawing more attention to it by launching an objection was a reasonable trial tactic. Moreover, we discern no reasonable probability that the outcome of the trial would have been different had counsel objected.

## D. Redaction

The Petitioner claims that counsel provided ineffective assistance because he failed to object to redaction of his taped interview. He avers that the "redactions included statements that the reason he did not trust police officers was a prior occasion, years earlier, when he was shot by an officer."

At the evidentiary hearing, the Petitioner claimed that he told counsel he did not want the State to admit a redacted version of his statement to police at trial. He elaborated that he wanted to introduce the entire statement because it would have offered further explanation for his comment "that I can't stand the police[.]" Counsel testified that he did not remember whether he and the Petitioner discussed redactions in the Petitioner's statement but that it was not much of an issue to him because one could not hear part of what the Petitioner said in his statement due to his damaged voice box.

The post-conviction court determined that counsel's failure to object to the introduction of the Petitioner's redacted statement was not deficient because "the Petitioner ha[d] not offered sufficient proof for the [c]ourt to determine that [counsel] did not have a tactical reason for failing to make the objection[]" (I: 186) and "even if [counsel] should have objected to the admission of the redacted portions of the Petitioner's statement to police[,] . . . the [c]ourt does not find that the result of the proceeding would be different."

We agree that the Petitioner has failed to prove that counsel performed deficiently in failing to object to the introduction of the redacted statement and, moreover, that admission of the unredacted statement would have had minimal effect on the Petitioner's case in light of the evidence against him.

### E. Cross-Examination of Witnesses

The Petitioner claims that counsel provided ineffective assistance because he failed to effectively cross-examine witnesses, namely co-defendant Leangelo Ramey and Bradley Jaimon Bryant.

In addressing this claim, the post-conviction court observed that choosing which issues to focus on in cross-examination was "the type of strategic decision that a trial court is not to second-guess in the tactical realm." The court also observed that this court on direct appeal had noted that "[a]ll witnesses [in this case] were thoroughly cross-examined." Kevin Lamont French, 2014 WL 3530947, at *13. The court concluded that counsel's "decisions regarding what issues to focus on in cross-examination were reasonable tactical decisions such that his representation did not constitute deficient performance."

At the evidentiary hearing, counsel, an attorney with almost forty years' experience practicing criminal law, testified that he believed that he effectively cross-examined Mr. Ramey. While counsel might not have delved into the minute details now requested by the Petitioner, the record does not indicate that counsel was deficient in his cross-examination. As to Mr. Bryant, the Petitioner admitted at the evidentiary hearing that Mr. Bryant did not identify him as the shooter at trial. Therefore, even assuming there was some deficiency in counsel's cross-examination of Mr. Bryant, such deficiency did not cause him prejudice.

## F. Issues on Appeal

The Petitioner claims that he received ineffective assistance with regard to his direct appeal because four of the issues presented to this court were deemed to be waived for having not been included in the motion for new trial. It is not entirely clear whether the Petitioner specifically contends that trial counsel was ineffective for failing to preserve the issues in the motion for new trial that were ultimately deemed waived on appeal or that appellate counsel was ineffective for failing to raise the issues preserved in the motion for new trial rather than the issues he raised.

As indicated, on direct appeal, this court determined that four of the issues presented by the Petitioner were waived due to not being included in his motion for new trial: (1) the trial court erred by admitting prior bad act testimony; (2) the trial court erred by admitting a letter purportedly written by the Petitioner; (3) the trial court erred by admitting testimony regarding weapons found in the Petitioner's home; (4) the assistant district attorney general committed prosecutorial misconduct during closing arguments. Id. at *14.

At the evidentiary hearing, trial counsel agreed that this court ruled that some of the issues appellate counsel raised on appeal were waived because they had not been included in the motion for new trial. In addition, trial counsel noted that appellate counsel did not raise some of the issues that trial counsel had raised in the motion for new trial.

In ruling on this issue, the post-conviction court first observed that appellate counsel was not required to "raise every conceivable issue on appeal," and that "[c]ourts are to give 'considerable deference' to appellate counsel's professional judgment with regard to which issues to raise on appeal." The post-conviction court determined that trial counsel's decision to raise only the issues he felt were the strongest in the motion for new trial was not deficient, and that "none of the issues that [counsel] failed to include in the motion for new trial were so plainly meritorious that it was unreasonable for him to not include those issues." The court also determined, assuming arguendo that counsel should have included those issues in the motion for new trial, that the Petitioner was not prejudiced by counsel's failure to do so. In making this determination, the court relied on its own assessment of the evidence, as well as this court's determination on direct appeal that "plain error review

is not proper because in light of the overwhelming evidence against the accused, none of the alleged errors would have 'probably changed the outcome of the trial'; thus, consideration of the alleged errors is not necessary to do substantial justice." Id. (citations omitted).

Likewise, the post-conviction court found that "deference to [appellate counsel]'s decisions in which issues to pursue on appeal is appropriate because those choices were well within the range of competence required of attorneys. None of the issues which the Petitioner claims should have been raised were of significant merit."

Upon review, we conclude that neither trial nor appellate counsel were deficient for raising the issues he each, respectively, discerned as most meritorious. Moreover, because this court on direct appeal declined to review the four issues pointed to by the Petitioner under the plain error doctrine, the Petitioner has not established that this court would have granted him relief on direct appeal had those four issues been properly reserved.

## II. Prosecutorial Misconduct

The Petitioner next argues the stand-alone claim that the State committed prosecutorial misconduct in closing argument. He "does not contend that any intentional misconduct occurred, but that the statements presented as cause were made 'in the heat of the battle[,]' . . . but that the prejudicial effect on the jury would have been no less injurious to his rights[.]" Although the Petitioner does not explicitly state so in the argument of his brief, we presume he is referring to the State's "mischaracterization" of Ms. McLemore's identification of him as the shooter as the misconduct at issue.

The five generally recognized areas of prosecutorial misconduct occur when the prosecutor intentionally misstates the evidence or misleads the jury on the inferences it may draw from the evidence; expresses his or her personal opinion on the evidence or the defendant's guilt; uses arguments calculated to inflame the passions or prejudices of the jury; diverts the jury from its duty to decide the case on the evidence by injecting issues broader than the guilt or innocence of the accused under the controlling law or by making predictions on the consequences of the jury's verdict; and intentionally refers to or argues facts outside the record, other than those which are matters of common public knowledge. State v. Goltz, 111 S.W.3d 1, 6 (Tenn. Crim. App. 2003). Tennessee courts "have traditionally provided counsel with a wide latitude of discretion in the content of their final argument" and trial judges with "wide discretion in control of the argument." State v. Zirkle, 910 S.W.2d 874, 888 (Tenn. Crim. App. 1995). A party's closing argument "must be temperate, predicated on evidence introduced during the trial, relevant to the issues being tried, and not otherwise improper under the facts or law." State v. Middlebrooks, 995 S.W.2d 550, 557 (Tenn. 1999).

As summarized above, the record shows that during closing argument, the State argued that Ms. McLemore "viewed a photo lineup and was able to identify the [Petitioner]." Later, the State commented that Ms. McLemore "identif[ied] the [Petitioner] as the shooter." During closing argument for the defense, counsel clarified that "Ms. McLemore testified from the stand that she looked at a photo lineup[] and said she wasn't a hundred percent sure but she circled the face of [the Petitioner] and said, it kind of looks like. It resembles him." Counsel also reminded the jury that Ms. McLemore said that she only saw the suspected perpetrator "very briefly . . . it was just an instant."

In ruling on this issue, the post-conviction court determined that "none of the statements the Petitioner claims constituted misconduct were actually improper" as the remarks were "reasonable inferences that can be drawn from the facts." The court also noted that it instructed the jury that the statements of the attorneys did not constitute evidence, and that it was to decide the case on the evidence introduced at trial. The court further determined that even if the prosecutor's remarks were improper, the cumulative effect of the comments was minor, "particularly in comparison [to] the strength of the State's case overall."

The record supports the post-conviction court's determinations. The State's comments during closing argument were not outside the bounds of reasonable inferences from the evidence and were not so inflammatory that they prejudiced the jury. In addition, counsel clarified and counter-attacked the State's comments during his closing argument, and the trial court instructed the jury that it was to base its decision only on the evidence. The Petitioner is not entitled to relief on this issue.

### III. **Brady** Claim

The Petitioner next claims that the State committed a Brady violation, i.e., withheld exculpatory evidence, because it failed to disclose a surveillance video from a business near the scene of the crime. He contends that the video was material because "production of the video would have . . . led him to additional witnesses that may have had crucial information regarding the events that occurred."

In Brady v. Maryland, 373 U.S. 83, 87 (1963), the United States Supreme Court held that the prosecution has a duty to furnish to the defendant exculpatory evidence pertaining either to the accused's guilt or innocence or to the potential punishment that may be imposed. The Court explained that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Id. In order to establish a Brady violation, a defendant must show that he or

she requested the information, the State suppressed the information, the information was favorable to his or her defense, and the information was material. State v. Jackson, 444 S.W.3d 554, 594 (Tenn. 2014). Evidence that is "favorable to an accused" includes evidence that exculpates the defendant or evidence that could be used to impeach the State's witnesses. Johnson v. State, 38 S.W.3d 52, 55 (Tenn. 2001). Evidence is "material" if there is a reasonable probability that the result of the proceeding would have been different had the evidence been disclosed to the defense. Id. at 58. A Brady claim in a post-conviction proceeding is "governed by the same prejudice standard as an ineffective assistance of counsel claim." Cauthern v. State, 145 S.W.3d 571, 599 (Tenn. Crim. App. 2004). "[A] defendant must show that there is a reasonable probability that the result of the proceedings would have been different." Id. at 598-99.

At the evidentiary hearing, counsel testified that he did not receive a copy of a surveillance video from the business across the street from the scene of the murder if one existed and, had one existed, he would have obtained a copy of it so he could determine whether it was of any value to the Petitioner. The Petitioner alleged that he never received the surveillance video from the store across the street from the murder in discovery, which he asserted that the State relied on as the factual basis in its warrant for the phone records of Natasha Lockett and Amanda Crawford. Detective Harris acknowledged that one of the applications for a court order to obtain cellphone records referred to a surveillance video taken from a business across the street from the car wash where the murder took place. He agreed that the police took custody of the surveillance video footage at some point and he reviewed it, but he had no knowledge of whether the Petitioner received the recording in discovery. Detective Harris recalled that a portion of the road in front of the car wash could be seen on the video, but the car wash itself could not.

In ruling on this issue, the post-conviction court determined that the Petitioner did not establish that a Brady violation had occurred because the surveillance footage was not material. The court concluded that "[e]ven if [it] accepts the Petitioner's unsubstantiated conclusion that the footage contained information favorable to him by allowing him to determine if the woman on the phone was Ms. Tasha Lockett or Ms. Amanda Crawford," the video did not show the parties actually involved in the homicide and production of the video would not have "placed the case in a different light."

The evidence does not preponderate against the findings of the post-conviction court. The Petitioner himself only claims that the surveillance video would have "led him to additional witnesses that may have had crucial information regarding the events that occurred." The Petitioner failed to establish that the footage would have exculpated him or been used to impeach any of the State's witnesses at trial. Even if the Petitioner had been able to view the video and learn of "additional witnesses," we agree with the post-conviction court's assessment that "in no way the production of that video [would] have

placed the case in a different light, particularly in light of the strength of the other evidence supporting the convictions."

## IV. Actual Innocence

The Petitioner lastly claims that "if given a new trial, he would gladly bear the burden of proving his actual innocence." In addressing this claim, the post-conviction court observed that this court "has consistently held that a freestanding 'claim of actual innocence that is not based on scientific evidence . . . may not be raised in a post-conviction relief petition.'"

Initially, we observe that the Petitioner has waived review of this issue for failing to support his claim with "argument, citation to authorities, or appropriate references to the record[.]" Tenn. R. Ct. Crim. App. 10(b). The Petitioner's analysis on this issue consists of one paragraph in which he does not cite to any facts or case law in support of his claim.

In any event, even if not waived, the post-conviction court properly denied relief. A Petitioner may raise a claim of actual innocence based on new scientific evidence in a petition for post-conviction relief. See Dellinger v. State, 279 S.W.3d 282, 290-91 (Tenn. 2009); see also Tenn. Code Ann. §§ 40-30-102(b)(2), -117(a)(2). However, this court has repeatedly held that claims of actual innocence not based on newly discovered scientific evidence are not cognizable in a petition for post-conviction relief. See Shaun Alexander Hodge v. State, No. E2009-02508-CCA-R3-PC, 2011 WL 3793503, at *7-8 (Tenn. Crim. App. Aug. 26, 2011), perm. app. denied (Tenn. Feb. 15, 2012); James W. Vanover v. State, No. E2010-00203-CCA-R3-PC, 2011 WL 3655136, at *5 (Tenn. Crim. App. Aug.19, 2011), perm. app. denied (Tenn. Oct. 18, 2011); see also Dellinger, 279 S.W.3d at 291 n.7. The Petitioner failed to introduce any new scientific evidence that would support his claim of actual innocence; therefore, the post-conviction court properly denied relief.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the denial of the Petitioner's petition for post-conviction relief.

_____
ALAN E. GLENN, JUDGE

- 30 -